Harry DILLON, Sr., Faye Dillon, Silas V. Cross, Millie Cross, Silas A. Cross, Francine Cross, James M. and Roleen L. Hargrove, Theodore K. & Elizabeth V. Gord, Appellants,

v.

UNITED STATES of America, and Commissioner of Internal Revenue, Appellees.

Nos. 85–3676, 85–3677, 85–7365, 85–7424 and 84–7863.

United States Court of Appeals, Ninth Circuit.

Argued * and Submitted May 7, 1986.

Decided June 19, 1986.

---

* Cross alone was argued. Dillon, Gord and Hargrove were submitted without argument on motion of the appellants.

Janet Jordan Dillon, Tacoma, Wash., for amicus curiae Charles Saunooke et al.

Charles A. Hobbs, Hobbs, Straus, Dean & Wilder, Washington, D.C., Christopher R. Boutelle, Potter & Boutelle, and John Bell, Tacoma, Wash., for appellants.

Silas V. Cross, pro se.

Roger M. Olsen, Acting Asst. Atty. Gen., Richard Farber and Douglas C. Coulter, Dept. of Justice, Washington, D.C., for appellees.

Before WRIGHT and ANDERSON, Circuit Judges, and CROCKER,** Senior District Judge.

EUGENE A. WRIGHT, Circuit Judge.

These appellants, enrolled members of the Puyallup Indian Nation, operated smokeshops on allotted land in the Puyallup Reservation in Pierce County, Washington. They asserted unsuccessfully before the district court or the Tax Court that their business income was exempt from federal income tax under the Medicine Creek Treaty of 1854, the General Allotment Act of 1887 and the United States Constitution. In the alternative, they argued that a portion of their income, equivalent to the fair rental value of their land, should be tax exempt.

In affirming the judgments below, we answer in the negative each of these questions:

1. Is income from a smokeshop on Indian trust land exempt from federal income taxation under the Medicine Creek Treaty?

2. Is it exempt under the General Allotment Act, applying the rule of *Squire v. Capoeman,* 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956)?

3. Does equal protection require such income to be accorded the same tax-ex-

empt status as that derived from agricultural, timber, mineral and other land-based activity?

4. Can an exemption for such income be found in congressional policy favoring tribal self-sufficiency?

5. Can the fair rental value of the land be allocated to "income derived directly from the land," to qualify for exemption under the *Capoeman* rule?

## FACTS AND PROCEEDINGS BELOW

### Dillons

During 1974 and 1975, the Dillons operated a smokeshop on property allotted under the Indian Reorganization Act (IRA), 25 U.S.C. § 465. They filed a joint tax return for 1974 but filed none for 1975. The IRS assessed additional taxes for both years.

The Dillons filed a refund action in federal district court, claiming that the smokeshop income was exempt under the Medicine Creek Treaty of 1854. The court concluded that the Treaty did not exempt smokeshop income and dismissed their claim for a tax refund.

### Gords

During 1977 and 1978, the Gords operated a smokeshop on land held in trust pursuant to the IRA. They did not file a tax return for 1977, and the joint return filed for 1978 did not include smokeshop income.

They petitioned the Tax Court for a redetermination of deficiencies assessed by the IRS. They claimed an exemption under the Medicine Creek Treaty and the IRA. They asserted also that taxation of smokeshop income violated the Fifth Amendment and Article I of the Constitution. In the alternative, they claimed that a portion of the smokeshop income (equivalent to the fair rental value of the land) was exempt from taxation.

The Tax Court sustained the IRS determinations, relying on its decision in *Cross,* filed the same day.

** Of the Eastern District of California.

## Crosses

In 1976, Silas V. Cross earned income from the operation of a smokeshop on the Puyallup Reservation. His son received wages for working in the smokeshop during 1976. Neither amount was reported on their respective joint 1976 tax returns. The IRS assessed deficiencies. Crosses' petitions to the Tax Court were based on the same theories asserted by the Gords.

The Tax Court, in an opinion reviewed by the full court, sustained the IRS deficiency determinations.

## Hargroves

During 1977, 1978 and 1979, Hargroves were partners in a smokeshop located on allotted trust land. They did not include income from the partnership on their federal returns for those years.

They petitioned the Tax Court for a redetermination of deficiencies assessed by the IRS. The legal theories for exemption were identical to those raised by the Gords and the Crosses. The Tax Court, relying on its earlier decision in *Cross,* sustained the deficiencies.

### A. *Standard of Review*

■ This court reviews de novo the interpretation and application of a treaty. *Kamrin v. United States,* 725 F.2d 1225, 1227 (9th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 85, 83 L.Ed.2d 32 (1984). The district court's interpretation of a tax exemption accorded under the General Allotment Act is a conclusion of law reviewed de novo. *Kirschling v. United States,* 746 F.2d 512, 514 (9th Cir.1984).

### B. *Introduction*

■ Under Sections 1 and 61 of the Internal Revenue Code, federal income tax applies to "every individual" and to "all income from whatever source derived." 26 U.S.C. §§ 1, 61. As a general rule, Indians, like other citizens, are subject to federal income taxation unless exempted by a treaty or an act of Congress.[1] *Hoptowit v. Commissioner,* 709 F.2d 564, 565 (9th Cir. 1983).

### C. *Medicine Creek Treaty*

In each case, taxpayers claim income tax exemption under Articles 6 and 12 of the Treaty of Medicine Creek, 10 Stat. 1132. They contend that the Treaty preserved the Puyallups' right to trade and that taxation of smokeshop income impermissibly restricts that right in violation of the Treaty.

### 1. *Article 6*

This article authorizes the President to assign surveyed lots to Indians. It incorporates by reference Article 6 of the Treaty with the Omahas, providing that

> such assigned land ... shall not be aliened or leased for a longer term than two years; shall be exempt from levy, sale or forfeiture ... until a State Constitution, embracing such lands within its boundaries, shall have been formed, and the legislature of the State shall remove the restrictions.

557 F.2d 646, 649 n. 9 (9th Cir.1977), *cert. denied,* 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 754 (1978).

Cross argues also that the Internal Revenue Code cannot apply to treaty Indians because they *are not* Constitutional citizens." This contention is also without merit. The Supreme Court has decided that "Indians are citizens and that in ordinary affairs of life, not governed by treaties or remedial legislation, they are subject to the payment of income taxes as are other citizens." *Squire v. Capoeman,* 351 U.S. 1, 6, 76 S.Ct. 611, 615, 100 L.Ed. 883 (1956). The issue here is not whether appellants are within the scope of the Code, but whether any treaty or statute exempts their smokeshop income.

---

1. Only Cross argues that federal income tax laws cannot apply to Indians because of an express constitutional prohibition. He contends that the reach of the Sixteenth Amendment is restricted by the phrase "excluding Indians not taxed" in art. I, § 2, cl. 3 of the Constitution. His challenge to the general applicability of federal income tax laws to Indians is without merit.

The reference to "Indians not taxed" in Article I of the Constitution recognizes merely that some Indians were not taxed by the states in which they resided. It does not restrain the federal government from taxing Indians. *Jourdain v. Commissioner,* 617 F.2d 507, 509 (8th Cir.), *cert. denied,* 449 U.S. 839, 101 S.Ct. 116, 66 L.Ed.2d 46 (1980). *See also Fry v. United States,*

Treaty with the Omahas (1854), 10 Stat. 1043.

The government contends that these articles merely prohibit the forced transfer of assigned Indian lots until the property comes under the jurisdiction of a state constitution. The taxpayers contend that Article 6 reflects the intention of the parties to the Treaty to limit taxation to the possible future taxation of lands. To prevail on their claim, taxpayers must demonstrate that this restriction on alienation can reasonably be construed as a permanent federal income tax exemption for businesses operated on treaty land.

■ The rule that ambiguous statutes and treaties are to be construed in favor of Indians applies to tax exemptions. *Choate v. Trapp*, 224 U.S. 665, 675, 32 S.Ct. 565, 569, 56 L.Ed. 941 (1912). However, this rule applies "only if such statute or treaty contains language which can reasonably be construed to confer income [tax] exemptions." *United States v. Anderson*, 625 F.2d 910, 913 (9th Cir.1980) (quoting *Holt v. Commissioner*, 364 F.2d 38, 40 (8th Cir. 1966), *cert. denied*, 386 U.S. 931, 87 S.Ct. 952, 17 L.Ed.2d 805 (1967)), *cert. denied*, 450 U.S. 920, 101 S.Ct. 1367, 67 L.Ed.2d 347 (1981). "The intent to exclude must be definitively expressed ...." *Choteau v. Burnet*, 283 U.S. 691, 696, 51 S.Ct. 598, 600–01, 75 L.Ed. 1353 (1931).

■ The suggestion that an income tax exemption can be inferred from the alienation restrictions in Article 6 of the Treaty is not well founded. "Nontaxability and restriction upon alienation are distinct things." *Superintendent of Five Civilized Tribes v. Commissioner*, 295 U.S. 418, 421, 55 S.Ct. 820, 822, 79 L.Ed. 1517 (1935). An Indian's "wardship [status] with limited power over his property does not, without more, render him immune from the common burden [of federal income taxation]." *Id.*

2. *Article 12*

■ Taxpayers contend that the geographic trade limitation in this article of the Treaty must be construed to confer an income tax exemption. It provides: "The said tribes and bands finally agree not to trade at Vancouver's Island, or elsewhere out of the dominions of the United States." Medicine Creek Treaty, 10 Stat. 1132.

Taxpayers argue that the parties intended no other restrictions on trading rights reserved to the Puyallup Indians. This court rejected a similar argument in *Strom v. Commissioner*, 6 T.C. 621, 627 (1946), *aff'd per curiam*, 158 F.2d 520 (9th Cir. 1947). It affirmed the Tax Court's holding that the imposition of a tax upon *income* earned in carrying on a treaty-protected activity is not an impermissible restriction upon the *right* guaranteed by the Treaty. The court in *Strom* emphasized that at the time of the treaty execution, the parties "certainly, did not contemplate the present [federal income tax] situation." *Id.* at 628. The disputed income tax here, as in *Strom*, is not a burden upon the treaty-protected right, but upon the income earned through the exercise of that right. The Treaty is not violated here by the imposition of a federal tax on smokeshop income.

The government is correct that the substantial historical evidence offered by taxpayers here fails to demonstrate that the parties intended the treaty to exempt Indians from all taxation of their trading income. The courts below were correct in concluding that the claimed Article 12 exemption does not arise from the plain language of the Treaty. "[The Supreme] Court has repeatedly said that tax exemptions are not granted by implication.... It has applied that rule to taxing acts affecting Indians as to all others...." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 156, 93 S.Ct. 1267, 1274, 36 L.Ed.2d 114 (1973) (quoting *Oklahoma Tax Commission v. United States*, 319 U.S. 598, 606–07, 63 S.Ct. 1284, 1287–88, 87 L.Ed.2d 1612 (1943)).

While doubts about the meaning of an Indian treaty should be resolved in favor of the tribe, *Washington v. Washington Commercial Passenger Fishing Vessel Association*, 443 U.S. 658, 675–76, 99 S.Ct.

3055, 3069–70, 61 L.Ed.2d 823 (1979), the Treaty provisions relied on here are not ambiguous as to an income tax exemption. The reasonable inference from Articles 6 and 12 of the Treaty is that the parties did not intend geographic trade or alienation limitations to restrict the taxing authority of the United States to impose a tax not yet in existence. *See Earl v. Commissioner,* 78 T.C. 1014, 1017 (1982) (article in Medicine Creek Treaty reserving "the right of taking fish, at all the usual and accustomed grounds and stations," is insufficient to establish a tax exemption for income derived from exercising fishing rights guaranteed by the Treaty).

The Medicine Creek Treaty does not confer a tax exemption for smokeshop income.[2]

### D. *General Allotment Act*

Taxpayers contend that their smokeshop income is exempt from federal tax under the rule in *Squire v. Capoeman,* 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956), because it is "derived directly" from allotted land held in trust for them by the United States.

In *Capoeman,* the Court found an income tax exemption based on the General Allotment Act of 1887 (GAA), 25 U.S.C. § 331, et seq.[3] It found a congressional intent to exempt allotted *lands* from *all taxes* until the fee interest was conveyed to the allottee. It held that income received by noncompetent Indians from the sale of standing timber on allotted land was exempt from federal income tax but that "reinvestment income" was not. 351 U.S. at 9, 76 S.Ct. at 616. The Court defined the scope of this exemption: "It is clear that the exemption accorded tribal and restricted Indian lands extends to the *income derived directly therefrom." Id.* (quoting Cohen, *Handbook of Federal Indian Law,* 265).

The stated rationale for the "derived-directly-from-the-land" standard was the diminution of the land value.

> Once logged off, the land is of little value. . . . It can no longer be adequate to his needs and serve the purpose of bringing him finally to a state of competency and independence. Unless the proceeds of the timber sale are preserved for [the allottee], he cannot go forward when declared competent with the necessary chance of economic survival in competition with others.

*Id.* at 10, 76 S.Ct. at 617.

The taxpayers contend that the "derived directly" test has been misinterpreted and misapplied by the IRS and the courts. They argue that the *Capoeman* test, properly applied, would exempt "*any* income of an individual Indian which is produced by the individual from use of his or her allotted land."[4]

---

**2.** Taxpayers are correct that Congress is presumed not to intend an abrogation of rights guaranteed by Indian treaties when it passes general laws. *United States v. Farris,* 624 F.2d 890, 893 (9th Cir.1980), *cert. denied,* 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 839 (1981). "But this rule applies only to subjects specifically covered in treaties . . .; usually, general federal laws apply to Indians." *Id.* This court has concluded that "there is no such specific language in . . . the Treaty of Medicine Creek, 10 Stat. 1132 (1854)" sufficient "to exempt Indians from the laws of general applicability." *Id.* The Treaty does not bar the application of general tax laws to Indian taxpayers here.

**3.** The GAA authorized allotments of reservation land to Indians. Allotted land was to be held in trust by the United States, for the "sole use and benefit" of the Indian allottees, for a period of at least 25 years. At the end of the trust period,

the land was to be conveyed to the allottee "in fee, discharged of said trust and free of all charge or incumbrance whatsoever." The Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 462, extended the periods of trust "until otherwise directed by Congress."

**4.** Even if the rule in *Capoeman* exempts the smokeshop income from federal income taxation, it cannot exempt the income of Silas A. Cross. His income was compensation for personal services, not the use of trust property. *See Fry v. United States,* 557 F.2d 646 (9th Cir. 1977) (employee's income from logging on reservation land derives from employment contract, not the land, and is not exempt under *Capoeman*); *Commissioner v. Walker,* 326 F.2d 261, 264 (9th Cir.1964) (income received by employee as compensation for services rendered not "directly derived from tribal lands" and *Capoeman* rule is inapposite).

The IRS and the courts have applied the *Capoeman* standard to tax income from "non-land-based" businesses conducted on trust land. *Anderson*, 625 F.2d at 913 n. 3. *See, e.g., Critzer v. United States*, 220 Ct.Cl. 43, 597 F.2d 708 (1979) (en banc) (income from operation of motel, restaurant, and gift shop on tax-exempt tribal land), *cert. denied*, 444 U.S. 920, 100 S.Ct. 239, 62 L.Ed.2d 176 (1979); *Hoptowit v. Commissioner*, 78 T.C. 137 (1982) (income from smokeshop on allotted land), *aff'd as to other issue*, 709 F.2d 564 (9th Cir.1983); *Hale v. United States*, 579 F.Supp. 646 (E.D.Wash.1984) (rental income from smokeshop operated on allotted land).

Exemptions for income "derived directly" from the land have been upheld where the allottee has exploited or reduced the value of the land by mining, logging, agricultural or similar activity. *See, e.g., Stevens v. Commissioner*, 452 F.2d 741 (9th Cir.1971) (income from farming and ranching on allotted land); *United States v. Daney*, 370 F.2d 791 (10th Cir.1966) (income from oil and gas lease bonuses attributable to allotted land); *Big Eagle v. United States*, 156 Ct.Cl. 665, 300 F.2d 765 (1962) (royalty income from extraction of minerals from allotted land).

The "exploitation" rationale is inadequate to describe the "derived directly" standard. As the dissenting Tax Court judges in *Cross* noted: "Farming and ranching, unless improperly conducted, do not damage or diminish the value of the trust land." *Cross v. Commissioner*, 83 T.C. 561, 572 (1984).

We find the language in *Hoptowit v. Commissioner*, 78 T.C. 137 (1982), helpful in clarifying the application of the *Capoeman* rule. In *Hoptowit*, the Tax Court was confronted with a claim for exemption of smokeshop income. Like the taxpayers here, Hoptowit claimed that the smokeshop's location on the reservation was an essential factor in the generation of smokeshop income. *Id.* at 144. The Tax Court concluded that the taxpayer

did not receive the smokeshop income principally 'as a result of the use of reservation land and resources.' The mere fact that [the smokeshop] was located on reservation land is not determinative. The income was earned primarily through a combination of petitioner's labor, the sale of tobacco products (none of which were grown on reservation land, so far as it appears from the record), and the marketing of a claimed exemption from State taxes. In these circumstances, imposition of the income tax on petitioner's smokeshop income is not inconsistent with ... the Treaty; any exemption ... *would not extend to income only incidentally and not directly attributable to such land and resources.*

*Id.* at 145 (emphasis added).

In *Critzer v. United States*, 220 Ct.Cl. 43, 597 F.2d 708 (1979), an enrolled tribal member operated businesses and leased buildings on her possessory holding of reservation land.[5] She sought an income tax exemption under the General Allotment Act. 597 F.2d at 712. The Court of Claims denied the exemption. It found the business and rental income "was not directly derived from the land but rather emanated primarily from taxpayer's substantial investment in her improvements and her business activities related to those assets." *Id.* at 714. The court recognized that the land was of "*some* value," *id.* at 714, in generating the income but refused to attribute *all* the business income to the land.[6] *Id.*

---

**5.** The Puyallup Tribe contends that *Critzer* should not apply here because it involved possessory interests in *tribal* land instead of individual allotments. However, the court in *Critzer* attached no legal significance to the status of the land, finding a difference "only in the fact possessory holdings can never ripen into fee title." *Critzer*, 597 F.2d at 710. *See also Hale v.*

*United States*, 579 F.Supp. 646, 648 (E.D.Wash. 1984).

**6.** The Puyallup Tribe contends that *Critzer* ignored the *Capoeman* Court's intended distinction between "income from land" and "reinvestment income." This contention is without merit. The *Critzer* court's analysis implicitly concluded that business income attributable pri-

■ We follow the approach used in *Hoptowit* and *Critzer*. The tax exemption must be denied here under the *Capoeman* rule because the smokeshop income was not generated principally from the use of reservation land and resources. Instead, the income here was earned primarily through a combination of taxpayers' labor, the sale of goods produced off the reservation and improvements constructed on the trust land. This income is more akin to "reinvestment" income than income "derived directly" from the land and is taxable.[7]

### E. *Equal Protection*

■ Taxpayers contend that applying the *Capoeman* test to exempt income from mining, timber and agricultural activities on allotted land, while denying an exemption for smokeshop income, is a violation of their Equal Protection rights under the Fifth Amendment. The government responds that any variation in tax treatment stems from differences in the trust lands, not from discriminatory treatment of similarly situated Indian taxpayers.

We rejected a similar equal protection challenge in *Anderson*, 625 F.2d at 917. Our analysis in *Anderson* is applicable here:

> These are not suspect classifications, and no fundamental interest is involved. Therefore, the rational relation test applies, and the classifications "will not be set aside if any state of facts rationally justifying [them] is demonstrated to or perceived by the courts."

*Id.* at 917 (quoting *United States v. Maryland Savings-Share Insurance Corp.*, 400 U.S. 4, 6, 91 S.Ct. 16, 17–18, 27 L.Ed.2d 4 (1970)). *See also Regan v. Taxation With Representation*, 461 U.S. 540, 547, 103 S.Ct. 1997, 2001–02, 76 L.Ed.2d 129 (1983) ("Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes.")

We find that Congress rationally sought to help Indians by exempting them from taxation of income derived directly from trust land, while refusing to exempt income only incidentally attributable to the land. This is consistent with the purpose of the GAA, "the protection of the property right of the allottee during the trust period." *Hale*, 579 F.Supp. at 648.

### F. *Policy Considerations*

■ Taxpayers and amici curiae argue that taxation of smokeshop revenue here would be contrary to an overriding congressional policy to encourage tribal self-sufficiency and economic development.

To the extent this argument seeks to base an income tax exemption on policy considerations alone, without specific exemptive language in a statute or treaty, it must fail. In *Fry v. United States*, 557 F.2d 646 (9th Cir.1977), we held that it was error to create for Indians an income tax exemption based on policy alone:

> [I]t is one thing to say that courts should construe the treaties and statutes dealing with Indians liberally, and quite another to say that, based on these same policy considerations ..., courts themselves are free to create favorable

---

marily to factors other than the land was more closely akin to "reinvestment" income than income "derived directly" from the land. *Critzer*, 597 F.2d at 713–14. To accept taxpayers' argument here (that *all* income from a business on Indian land is tax-exempt) "would require [the court] to ignore the word 'directly' in the 'directly derived' test." *Id.* at 713.

7. Taxpayers claim also that their smokeshop income is exempt under two provisions of the Internal Revenue Code.

Section 894 provides: "Income of any kind, to the extent required by any treaty obligation of the United States, shall not be included in gross

income and shall be exempt from taxation under this subtitle." 26 U.S.C. § 894(a).

Section 7852 provides: "No provision of this title shall apply in any case where its application would be contrary to any treaty obligation of the United States in effect on the date of enactment of this title." 26 U.S.C. § 7852(d).

We need not decide whether § 894 (located in "Part II—Nonresident Aliens and Foreign Corporations") applies to Indian treaties. Neither statute creates an income tax exemption not otherwise expressly established by treaty. The effect of each statute is merely to preserve whatever tax exemption is granted by treaty.

rules.... Congress is the body which grants tax exemptions.

*Id.* at 649. *See also Anderson,* 625 F.2d at 917 (reversing grant of exemption that was based only on federal policies of optimal Indian land use and economic independence).

### G. *Allocation of Fair Rental Value to Income "Derived Directly" from Trust Land*

■ Taxpayers and amici curiae argue that, absent a full exemption for smokeshop income, they are entitled to exempt at least a portion of their income equal to the fair rental value of their property. This issue was discussed in *Critzer,* but that court refused to decide it on an inadequate record. 597 F.2d at 714. Five judges on the reviewing court in *Cross* dissented from the Tax Court's refusal to exempt "imputed rent" as "directly derived" from the land under the *Capoeman* test. *Cross,* 83 T.C. at 569.

This allocation argument is essentially another attempt by taxpayers to broaden the rule in *Capoeman* to exempt smokeshop income. The government's perspective on this issue is correct: "The simple answer to taxpayers' argument is that they did not receive any rental income with respect to their trust properties."

We reject taxpayers' allocation theory of exemption for two reasons.[8] First, allocating imputed rent income to the trust property is not required or permitted under the *Capoeman* rule. The bare land's fair rental value bears no rational relationship to the amount of income "derived directly" from the improved land. Such allocation would permit exemption of *all* income from a business on trust land up to the land's fair rental value, even where the income is otherwise clearly outside the "derived directly" standard of *Capoeman* (for example, selling stocks and bonds from a telephone booth on trust land). *See Critzer,* 597 F.2d at 713.

Second, taxpayers and amici curiae have cited no authority (and we have found none) for imputing rental income to a taxpayer using his own property in the operation of a business. Nor, under general tax laws, may a taxpayer using his own property to generate business income, deduct the annual fair rental value of the property from his business income. Moreover, guaranteeing a tax exemption equal to the fair rental value of the property, where no rent was actually paid or accrued, is contrary to the business expense provisions of 26 U.S.C. § 162(a).

We reject taxpayers' attempt to exempt a portion of their income based on the fair rental value of the property. As the majority in *Cross* below concluded: "Aside from the difficult computational and valuation problems involved, we are not willing to assume that this constructed value represents income 'directly derived' from the land." 83 T.C. 29 (1984).

### CONCLUSION

The judgments of the district court and Tax Court, finding the smokeshop income taxable, are affirmed. The Medicine Creek Treaty cannot reasonably be construed to exempt this income from federal taxation. Nor does the General Allotment Act exempt this income under the *Capoeman* rule, because it is not principally derived from the land or its resources.

We reject also taxpayers' attempt to exempt a portion of their smokeshop income, equivalent to the fair rental value of the land.

---

**8.** Taxpayers and amici curiae contend that the IRS has recognized the propriety of this allocation theory. They cite Rev.R. 60–377, but this revenue ruling was revoked in 1962 by Rev.R. 62–16.