**CHUGACH ALASKA CORPORATION; Chugach Development Corp.; Chugach Fisheries Inc.; Chugach Forest Products Inc.; Chugach Timber Corporation, Appellees,**

v.

**UNITED STATES of America, Appellant.**

No. 93–35795.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 3, 1994.

Decided Aug. 25, 1994.

Edward T. Perelmuter, U.S. Dept. of Justice, Tax Div., Washington, DC, for appellant.

John D. Taurman, Vinson & Elkins, Washington, DC, Peter W. Giannini, Law Offices of Giannini & Fehlen, P.C. Anchorage, AK, for appellees.

Before PREGERSON, CANBY, and BOOCHEVER, Circuit Judges.

PREGERSON, Circuit Judge:

## I. INTRODUCTION

The Internal Revenue Service ("IRS") appeals the district court's decision on an appeal from a bankruptcy court decision involving the Chapter 11 proceedings of Chugach Alaska Corporation ("Chugach"). This appeal addresses two issues, each of which requires us to interpret section 60(b)(5) of the Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, 579 (1984) ("DEFRA 1984"), as amended in 1986, which provided tax relief to Alaska Native Corporations ("Native Corporations"). The district court determined: (1) that Chugach, a Native Corporation, could carryback the net operating losses from its 1990 tax year to offset income assigned to it by another, profitable, corporation in Chugach's 1987 tax year; and (2) that Chugach could retain a sufficient quantity of the income assigned to it by the profitable corporation in the 1987 tax year to avoid paying any Alternative Minimum Tax ("AMT") for that year. We have jurisdiction under 28 U.S.C. §§ 158(d) and 1291. We affirm as to both issues.

## II. STATUTORY BACKGROUND

In 1971, Congress passed the Alaska Native Claims Settlement Act, 43 U.S.C. §§ 1601–1629 ("ANCSA"), to provide compensation to Native Alaskans in return for extinguishing their Alaska land claims. *See* H.R.Rep. No. 523, 92nd Cong., 1st Sess., *reprinted in* 1971 U.S.C.C.A.N. 2192, 2193. Under ANCSA, the newly-formed Native Corporations received 44 million acres of land and $962.5 million in monetary payments. 43 U.S.C. §§ 1605 and 1611. Chugach was created in 1972 as a Native Corporation under ANCSA.

In 1984, reacting to chronic Native Corporation financial difficulties caused by government delays in providing title to the promised land, Congress provided relief to the Native Corporations in the form of special

tax treatment. *See* § 60(b)(5) of DEFRA 1984, 98 Stat. at 579. The change temporarily exempted Native Corporations from new rules restricting the ability of unrelated corporations to affiliate for tax purposes to achieve income tax savings by offsetting one company's income against the other's losses.[1] The effect of § 60(b)(5) was to authorize Native Corporations to form "affiliated groups" with profitable corporations without regard to the restrictions, such as minimum shared equity requirements, to which such affiliations would otherwise be subject.[2] The purpose of § 60(b)(5) was therefore to allow Native Corporations to raise money by selling their net operating losses ("NOLs") and investment tax credits ("ITCs") to profitable companies in return for a share of the tax benefit gained by the profitable companies. *See* 132 Cong.Rec. S8175 (daily ed. June 23, 1986) (statement of Sen. Stevens) ("June, 1986 Statement").

This intention was initially frustrated by IRS interpretations restricting the benefits of § 60(b)(5). *Id.* Specifically, the IRS refused to rule that Internal Revenue Code ("I.R.C.") § 269 (relating to disallowance of deductions or credits following a tax-avoidance-motivated acquisition) and I.R.C. § 482 (relating to the IRS's authority to reallocate income, deductions, or credits among commonly controlled businesses) were inapplicable to Native Corporation-headed affiliated groups. So, in 1986, Congress passed clarifying language, to ensure that "the benefit of such losses and credits may not be denied in whole or in part by application of § 269, § 482, *the assignment of income doctrine, or any other provision of the Internal Revenue Code or principle of law.*" H.R.Rep. No. 841, 99th Cong., 2nd Sess., *reprinted in* 1986 U.S.C.C.A.N. 4075, 4928 (emphasis added).

The 1986 clarifying amendment strengthened § 60(b)(5) (redesignated as § 60(b)(5)(A)) by making it clear that the exemption from the DEFRA 1984 requirements for affiliated groups headed by Native Corporations was to be taken literally. The amendment also added a new § 60(b)(5)(B) of DEFRA 1984 that provided, with certain exceptions not applicable here, that until 1992,

> no provision of the Internal Revenue Code of 1986 (including sections 269 and 482) or principle of law shall apply to deny the benefit of use of losses incurred or credits earned by [a Native Corporation] to the affiliated group of which the [Native Corporation] is the common parent.

Tax Reform Act of 1986, Pub.L. No. 99–514, § 1804(e)(4), 100 Stat. 2085, 2801 (1986) ("1986 Act"). This is the critical language at issue in this case.[3]

## III. FACTUAL BACKGROUND

In the 1980's, the value of the timber and mineral holdings that Chugach had received under ANCSA plummeted. As a result, Chugach sustained large paper losses when it sold timber and other property in its 1987 tax year. It valued these net operating losses at $161.2 million dollars.

In the same year, Chugach availed itself of DEFRA 1984 § 60(b)(5) to sell its NOLs to two corporations, Winn–Dixie Stores ("Dixie") and Waste Management, Inc. ("WMI"). By the terms of Chugach's agreements with the two companies, (the "Agreements") Dixie and WMI assigned income, totaling $141.8 million, to Chugach, that they were thereby able to offset against Chugach's losses. In return, the companies agreed to pay Chugach a percentage of their tax savings, amounting to $.31 per dollar of offset income. This money was not to be made available to

---

1. Section 60(b)(5) of DEFRA 1984 provided, in relevant part: "The amendments made by subsection (a) [restricting the ability of companies to affiliate for tax purposes] shall not apply to any [Native Corporation] during any taxable year beginning before 1992 or any part thereof...."

2. "Affiliated groups" are permitted by the tax code to file consolidated income tax returns. *See* I.R.C. § 1501 (1987).

3. In 1988, Congress repealed the § 60(b)(5) exemption, but provided a grandfather clause for existing contracts up to a maximum of $40 million. *See* Technical and Miscellaneous Revenue Act of 1988 ("TAMRA 1988"), Pub.L. No. 100–647, § 5021, 102 Stat. 3342, 3666 (1988). The parties do not dispute that the transaction at issue here falls within the requirements of the grandfather clause and is therefore governed by DEFRA 1984 § 60(b)(5).

Chugach until a final determination was made that the NOLs were allowable.[4]

In 1991, Chugach entered Chapter 11 bankruptcy proceedings. In those proceedings, the IRS challenged the initial property valuations that had formed the basis of Chugach's 1987 claimed losses. In November of that year, Chugach agreed to a compromise settlement in its dispute with the IRS, establishing a new 1987 net operating loss of about $110.7 million, rather than the $162.2 million initially reported by Chugach, a difference of about $50 million. The $110.7 million net operating loss was sufficient to offset all of the income assigned to Chugach by Dixie, but it was insufficient to offset the additional income assigned to Chugach by WMI. In the 1987 Agreement, WMI had assigned about $106 million in income to Chugach. Chugach now had only about $66 million in NOLs with which to offset WMI's income. As a result, Chugach had about $40 million in "excess" assigned income from WMI for its 1987 tax year.

## A. Carryback of 1990 NOLs.

The IRS argues that this overassigned income must "spring back" to WMI, requiring

WMI to amend its 1987 tax return to report an additional $40 million in income. By the terms of the 1987 Agreement between WMI and Chugach, this adjustment would cost Chugach millions of dollars of the amount now held in "escrow," money that WMI had paid for the tax savings under its agreement with Chugach.

Chugach contends that it should be able to minimize the impact of the re-evaluation by carrying back the NOL from its 1990 tax year.[5] Chugach sustained about $22 million in net operating losses in that year. Chugach proposes to use these losses to offset the income assigned to it by WMI in the 1987 Agreement. The possibility of such a carryback was specifically included in the tax sharing agreement between Chugach and WMI. The first issue of the current dispute between the IRS and Chugach, then, centers on whether Chugach may carryback its $22 million 1990 tax year NOL to offset the income assigned to it in the 1987 Agreement with WMI.

This issue was first adjudicated by the Bankruptcy Court for the District of Alaska in May of 1992. *See In Re Chugach Alaska*

---

4. Although this was the substance of the transaction between the companies, the form of the actual agreement was more complicated. As described by Chugach:

> WMI and [Chugach] formed Seventh Rochelyss, Inc. ("SRI"), which issued a sufficient amount of its voting stock to [Chugach] to permit SRI to be included in the [Chugach] group. SRI issued the remainder of its stock (which included virtually all of its equity ownership) to WMI. WMI effectively transferred $106 million of its taxable income to SRI (and thus to the [Chugach] group) by causing several of its subsidiaries to enter into back-to-back service contracts with SRI on terms very favorable to SRI. SRI's $106 million of taxable income was offset by the NOLs of other members of the [Chugach] group. SRI paid [Chugach] $.31 per $1.00 of NOL utilized by SRI, an aggregate amount of $32,860,000. Shortly thereafter, WMI purchased all of the SRI stock owned by [Chugach], and SRI thus became a wholly owned subsidiary of WMI.
>
> Of the $32,860,000 paid by SRI to [Chugach] in respect of its NOLs, [Chugach] immediately lent $31,860,000 to WMI under [a] promissory note bearing interest at 8 percent per annum (the "WMI Note"). The WMI Note was pledged to WMI to provide security for [Chugach's] obligation to repay SRI in the event its

claimed NOLs were not sustained. The WMI Note thus effectively acts as the "escrow" for the tax sharing payments ... The Balance of the WMI Note is to be paid to [Chugach] (if not offset against [Chugach's] repayment obligations to WMI and SRI) upon a final determination that the NOLs are allowable.

ER at 9–10 (paragraph numbers omitted).

A similar transaction was brokered with Dixie. For simplicity, we will henceforth describe the transactions between WMI, Dixie, Chugach, and the third companies in terms of their substance, i.e., the impact on Chugach and WMI, rather than their technical form.

5. I.R.C. § 172 permits a corporation to carryback its net operating losses up to three years, or to carry the losses forward up to 15 years, up to the full amount of the loss. The taxpayer takes advantage of this provision by filing an amended income tax return for the year in which the deduction is to be taken, claiming the subsequent year NOL as a deduction.

Thus, there is no dispute that Chugach would have been entitled to use its 1990 tax year losses to offset its *own* 1987 tax year income. The basis for the dispute here is Chugach's attempt to carryback its 1990 NOLs to offset the income of the affiliated group created by Chugach's 1987 Agreement with WMI.

*Corporation,* No. A91–00207–DMD (May 5, 1992). The bankruptcy court, relying primarily on the plain language of DEFRA 1984, § 60(b)(5), prohibiting the IRS from using any section of the Internal Revenue Code or principal of law "to deny the benefit of use of losses incurred" by a Native Corporation-headed affiliated group, held that Chugach was entitled to carryback the loss. The IRS appealed to the United States District Court, and the court affirmed. The IRS now appeals this ruling.

## B. Use of NOLs to Avoid AMT.

Even if Chugach prevails on the carryback issue, not all of the overassigned income from the WMI 1987 Agreement will be offset by Chugach's 1990 tax year net operating losses. The IRS proposes to "spring back" all remaining overassigned income to WMI's 1987 tax year account. If this were to happen, Chugach would essentially have no regular tax liability because its net operating loss would exactly equal its assigned income. But, this would expose Chugach to Alternative Minimum Tax ("AMT") liability.[6]

Chugach prefers to have a regular tax liability instead of an AMT liability because its 1987 tax sharing Agreement with WMI obligates WMI to pay any regular tax incurred by Chugach as a result of the Agreement, but includes no similar obligation for any AMT incurred by Chugach. In order to eliminate its AMT liability, Chugach argues that it should be able to retain enough of the income assigned from WMI by the 1987 Agreement to increase its regular tax to the point where the difference between the AMT calculation and the regular tax is zero. The second dispute between the parties thus centers on whether Chugach may retain some of the income assigned to it by WMI in the 1987

Agreement in order to avoid paying any AMT in the 1987 tax year.

Interpreting Chugach's claim on this issue as a plea for *exemption* from the AMT, the bankruptcy court agreed with the IRS that the benefits of § 60(b)(5) of DEFRA 1984 are limited to the regular tax, and do not extend to the AMT. The district court reversed the bankruptcy court. It pointed out that Chugach's planned use of the income assigned by the 1987 Agreement did not require Chugach to be *exempt* from the AMT. Rather, Chugach merely proposed to make use of its affiliation with WMI to maximize the benefits of its NOLs. This is precisely what was contemplated by Congress. Nothing in § 60(b)(5) limited the benefits a Native Corporation could derive from such a transaction to *regular* taxes. Therefore, the district court concluded that the IRS may not prevent Chugach from arranging its affiliation with WMI so as to minimize Chugach's AMT.

## IV. DISCUSSION

Although the concepts and factual context of each of the issues raised in this appeal are difficult and complex, once the concepts are understood the arguments of each side are very simple. We are required to interpret only a single, brief, section of the Internal Revenue Code, and the legislative history of that section is exceedingly sparse.[7] Although each side claims that the legislative history supports its position, it is clear to us that the drafters of § 60(b)(5) spoke only in generalities that are not helpful in the particular circumstances of this case. What *does* come through clearly from the comments of Senator Stevens and the House Conference

---

**6.** The AMT "is, in effect, a true alternative tax, in the sense that it is computed by applying an alternative rate to an alternative income base and then paying it if and only if it exceeds the regular tax...." General Explanation of the Tax Reform Act of 1986, 99th Cong., 2nd Sess., 437 (1987) (the "Blue Book"). If the alternative calculation exceeds the regular tax, the difference between the two rates is the AMT, which must be paid in addition to the regular tax.

The AMT permits taxpayers to deduct only 90% of their NOLs. Therefore, if Chugach's assigned income were limited to an amount equal to its

NOLs, as proposed by the IRS, it would have to pay the AMT on 10% of the income assigned by WMI.

**7.** The sources of legislative history are: two brief statements made by Sen. Stevens on June 23, 1986, 132 Cong.Rec. S8175 (daily ed. June 23, 1986) and September 27, 1986, 132 Cong.Rec. S13932 (Daily ed. September 27, 1986), and two paragraphs in the Conference Committee Report of the 1986 Act. H.R.Conf.Rep. No. 841, 99th Cong., 2d Sess. (1986).

Report is that the legislation was intended to *help* the Native Corporations by unequivocally providing an opportunity for the Native Corporations to profit from their tax losses by selling those losses for cash to profitable companies. *See* sources cited *supra* at fn. 7.

 Because the issues before us are purely legal, our review of the district court's decision is de novo. *See In re Worcester,* 811 F.2d 1224, 1229–30 (9th Cir.1987). In seeking to interpret the statute at issue we are mindful that "ambiguous statutes that contain language that can reasonably be interpreted to confer a tax exemption for [Native Americans] should be construed in their favor." *Kirschling v. United States,* 746 F.2d 512, 515 (9th Cir.1984).[8]

### A. Carryback of 1990 Tax Year NOLs to Offset Income Assigned in the 1987 Tax Year.

█ The IRS contends that the "assignment of income" doctrine prevents Chugach from using its 1990 NOLs to offset the income assigned to it by WMI under the 1987 Agreement. The assignment of income doctrine provides that "income must be taxed to him who earns it.... The entity earning the income ... cannot avoid taxation by entering into a contractual arrangement whereby that income is diverted to some other person or entity." *United States v. Basye,* 410 U.S. 441, 449, 93 S.Ct. 1080, 1086, 35 L.Ed.2d 412 (1973) (citation omitted). *See also United States v. Russell,* 804 F.2d 571, 574–75 (9th Cir.1986). The IRS concedes that § 60(b)(5) overrides this doctrine when the Native Corporation incurs net operating losses in the same year that the profitable company earns the income it seeks to offset. But the IRS denies that § 60(b)(5) extends to net operating losses incurred in a *different* year from when the offsetting income was earned. "Essentially, the Government's position on the 1990 NOL issue reduces to the proposi-

tion that losses [at issue] may not be applied against WMI's 1987 income because the assignment of income privilege conferred by [§ 60(b)(5) of DEFRA 1984] was limited to the amount of Chugach's losses that were in existence *at the time the consolidated return was filed."* Blue Brief at 19 (emphasis in original).

The response put forward by Chugach, and accepted by both the bankruptcy court and the district court, is simple and compelling. It is that the plain language of DEFRA 1984 § 60(b)(5)(B) prevents the IRS from using *any* "provision of the Internal Revenue Code ... or principle of law ... to deny the benefit or use of losses incurred or credits earned by a [Native] Corporation to the affiliated group of which the Native Corporation is the common parent." There is no doubt that the assignment of income doctrine is a principle of law. *Cf.* Statement of Sen. Stevens, 132 Cong.Rec. S13932 (Daily ed. September 27, 1986) (listing the assignment of income doctrine as among the principles of law the section was intended to cover). Nor is there any doubt that the IRS intends to use that principle to deny the benefit of Chugach's losses to the affiliated group of which Chugach is the parent. As the bankruptcy court and the district court noted, the additional requirement, urged on us by the IRS, limiting the statute's benefits to losses incurred "at the time the consolidated return was filed," Blue Brief at 19, is absent from the statute as written.

The IRS's arguments never quite come to grips with this fundamental flaw. For example, the IRS highlights the last phrase of the section at issue, limiting the section's reach "to the affiliated group of which the Native Corporation is the common parent." According to the IRS, this language somehow imparts a "temporal limitation" on the carryback of Native Corporation NOLs. But we can think of no theory, not relying on circular

---

8. The IRS complains that this rule of construction should not be applied in this case because it applies only where "[t]he intent to exclude [is] definitively expressed." *Dillon v. United States,* 792 F.2d 849, 853 (9th Cir.1986) (internal quotation marks and citations omitted), *cert. denied,* 480 U.S. 930, 107 S.Ct. 1565, 94 L.Ed.2d 757 (1987). Contrary to the IRS's position, it is

abundantly clear that § 60(b)(5) of DEFRA 1984 definitely expressed an intention to exempt Native Corporations from the normal affiliation rules. The only question is the nature and extent of that exemption. Under such circumstances, it is appropriate to resolve ambiguities in favor of the Native Corporations the statute was designed to help.

logic, by which there is any inconsistency between the quoted language and a rule permitting Native Corporations to carryback NOLs from future years.

The IRS also points to the fact that the statute does not explicitly state that overassigned income may be offset by NOLs in a future year. First, we note that we do not view the dispute here as being whether overassigned income may be offset by NOLs in future years. We agree with the IRS that any truly overassigned income must revert to the assigning profitable company. The question here is how much of the income was actually overassigned on Chugach's amended 1987 income tax return. Today we hold that there is no over-assignment to the extent that Chugach's losses from the 1990 tax year were carried back on its amended 1987 tax return. This conclusion follows because Chugach would normally have been permitted, under I.R.C. § 172, to claim its 1990 tax year losses on its amended 1987 tax return, and because § 60(b)(5) plainly permitted Chugach to sell the losses from its 1987 tax return to a profitable corporation.

It means nothing that the carryback of future NOLs was not explicitly mentioned in § 60(b)(5). Section 60(b)(5) permits Native Corporations to use their net operating losses to offset the income of unrelated private companies. It therefore implicitly references the other sections of the Code that define which NOLs Native Corporations may claim: if a loss can be claimed by the Native Corporation, it can also be sold to a profitable company and claimed on its consolidated return. I.R.C. § 172 permits all companies, not just Native Corporations, to amend their tax returns and reflect losses incurred in future years. Therefore, those future losses could be claimed on Chugach's 1987 amended return. Congress need not explicitly mention each and every scenario by which a Native Corporation may incur the losses it proposes to sell.

The IRS contends that our interpretation of § 60(b)(5) will allow a profitable company *deliberately* to overassign income against a Native Corporation's non-existent losses, in the hopes that the Native Corporation might experience such losses within three years. We do not agree that such an absurd result follows from our interpretation of the statute. By our interpretation, a profitable corporation cannot derive any tax benefit from a Native Corporation's NOLs unless and until the Native Corporation actually *has* such NOLs to report, either as a result of losses in the year that the profitable company earns the offsetting income or as a result of losses in another year that can be carried back to the year in question. *False* reporting of such losses would be a fraudulent act. This practice obviously would not be permitted by the Internal Revenue Code.[9]

## B. AMT Liability.

■ Resolution of the AMT issue follows along the same lines. As discussed above, the IRS challenged Chugach's ability to retain some of the income assigned to it under the 1987 income sharing Agreement with WMI in order to eliminate its AMT. The IRS reasons that § 60(b)(5) "was not designed to exempt [Native Corporations] from payment of AMT." Blue Brief at 27. This is true, as far as it goes, but it misses Chugach's point. Chugach concedes that it is not exempt from the AMT. It merely desires to be able to make use of its NOLs in its tax sharing agreement in such a fashion as to minimize its AMT.

Chugach argues that the IRS's position on the AMT issue denies it the "benefit or use" of its losses, in contravention of the plain meaning of DEFRA 1984 § 60(b)(5), which authorizes Native Corporations to make use of and derive benefit from their tax losses. The IRS response scrupulously avoids any discussion of the plain meaning of the statute. Instead, it argues that Chugach's position is "patently illogical," because Chugach's taxes will actually be *lower* if the IRS pre-

9. On the other hand, we see no reason that a company could not agree with a Native Corporation to create an affiliated group that would file an amended return, with tax benefits to both parties if, within three years, the Native Corpora-tion experienced losses that could be carried back to the tax year in question. Such an agreement would be fully consistent with the language and purpose of § 60(b)(5) of DEFRA 1984.

vails.[10] It is true that under the peculiar circumstances of this case, and of Chugach's 1987 Agreement sharing income with WMI, Chugach will derive a greater benefit from a higher regular tax than from a lower one. But Chugach's position is neither illogical nor illegal. Nothing in the tax code or anywhere else forbade it from structuring its affiliations with other companies so as to minimize its AMT as well as or even instead of its regular tax. As the district court pointed out, § 60(b)(5) does not distinguish between these two types of taxes.

Nor are the "benefits" that may permissibly be derived from such affiliations limited to *tax* benefits, as implied by the IRS in its briefs. *See* Blue Brief at 29 (Section 60(b)(5) "was not a device through which [Native Corporations] could maximize their benefits under private agreements"). Rather, private agreements and payments to the Native Corporations were the *primary* benefit intended by § 60(b)(5). *See* June, 1986 Statement of Sen. Stevens (explaining that the purpose of the 1986 amendment to § 60(b)(5) was to allow Native Corporations to receive "an infusion of capital" from profitable companies who, in turn, would receive tax savings from the Native Corporation NOLs).

Thus, not only is Chugach's reading of the statute consistent with its language, it also comports with its primary purpose, which was to allow Native Corporations, such as Chugach, to structure deals with other companies so as to derive benefit from their NOLs. Section 60(b)(5) therefore permits Native Corporations to form affiliations to benefit from their NOLs. Requiring Chugach to structure its affiliation with WMI so as to incur AMT liability is inconsistent with this purpose.[11]

AFFIRMED.

---

10. As discussed above, Chugach seeks to structure its NOLs so as to increase its regular tax, which will be reimbursed by WMI under to the 1987 Agreement, and to decrease its AMT, which will not be similarly reimbursed under the Agreement.

11. To be clear, we do not hold that Native Corporations must *always* structure their income sharing agreements with profitable corporations so as to minimize their AMT liability, only that they *may* do so.