**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

KING MOUNTAIN TOBACCO
COMPANY, INC.,
*Defendant-Appellant.*

Nos. 14-36055
16-35607

D.C. No.
2:12-cv-03089-
RMP

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Rosanna Malouf Peterson, District Judge, Presiding

Argued and Submitted March 15, 2018
San Francisco, California

Filed August 13, 2018

Before: Ferdinand F. Fernandez, M. Margaret McKeown,
and Julio M. Fuentes,[*] Circuit Judges.

Opinion by Judge McKeown

---

[*] The Honorable Julio M. Fuentes, United States Circuit Judge for
the U.S. Court of Appeals for the Third Circuit, sitting by designation.

**SUMMARY**[**]

**Tax**

The panel affirmed the district court's judgment in favor of the United States in an action to collect delinquent federal excise taxes and penalties for the manufacture of tobacco products under 26 U.S.C. § 5701; and amended judgment determining the amount of those taxes.

The panel first held that it had jurisdiction over the appeal of the amended judgment as a final judgment under 28 U.S.C. § 1291, because the amended judgment sufficiently specified both the amount of money due the plaintiff and a formula for computing that amount of money.

The panel next held that a tobacco manufacturer located on trust land is subject to a federal excise tax applicable to all tobacco products manufactured in the United States under 26 U.S.C. § 5702. King Mountain Tobacco Company manufactures tobacco products and grows some of its own tobacco, on lands held in trust by the United States, within the boundaries of the Yakama Nation. The panel was unpersuaded by King Mountain's claim of exemption based on either the General Allotment Act of 1887 or the Treaty with the Yakamas of 1855.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Randolph H. Barnhouse (argued) and Justin J. Solimon, Johnson Barnhouse & Keegan LLP, Los Ranchos de Alburquerque, New Mexico; Timothy J. Carlson, Carlson Boyd PLLC, Yakima, Washington; for Defendant-Appellant.

Patrick J. Urda (argued), Teresa E. McLaughlin, and Gilbert S. Rothenberg, Attorneys; David A. Hubbert, Acting Assistant Attorney General; Tax Division, United States Department of Justice, Washington, D.C.; for Plaintiff-Appellee.

**OPINION**

McKEOWN, Circuit Judge:

In this case of first impression, we consider whether King Mountain Tobacco Company, Inc. ("King Mountain"), a tribal manufacturer of tobacco products located on land held in trust by the United States, is subject to the federal excise tax on manufactured tobacco products. The district court awarded the United States almost $58 million for unpaid federal excise taxes, associated penalties, and interest. Because we conclude that neither the General Allotment Act of 1887, 4 Stat. 388 (codified as amended in scattered sections of 25 U.S.C.), nor the Treaty with the Yakamas of 1855, 12 Stat. 951, entitles King Mountain to an exemption from the federal excise tax, we affirm the judgment of the district court.

## BACKGROUND

In 2006 the late Delbert Wheeler, Sr., a lifelong-enrolled member of the Yakama Nation in Washington State, purchased "80 acres of trust property . . . from the Yakama Nation Land Enterprise, the agency of the Yakama Nation which is charged with overseeing the maintenance of real property held in trust by the United States for the benefit of the Yakama Nation and its members." Wheeler then opened King Mountain Tobacco Company, which manufactures cigarettes and roll-your-own tobacco in a plant located on this trust land. After making significant investments to improve and develop the trust property, Wheeler transferred his interest in the property to King Mountain so that King Mountain could commence farming, agricultural, and manufacturing operations on Wheeler's land.[1]

King Mountain received a federal tobacco manufacturer's permit in February 2007. Today, King Mountain manufactures all of its tobacco products, and grows some of its own tobacco, on trust lands within the boundaries of the Yakama Nation. Some of those trust lands—including those on which King Mountain is located—are allotted to Wheeler, while others are allotted to other Yakama members.

King Mountain initially obtained all of the tobacco for its products from an entity in North Carolina. But according to King Mountain, "[t]obacco has historically grown on the Yakama Nation Reservation." Over time, King Mountain

---

[1] Mr. Wheeler died in June 2016. According to King Mountain, "[h]is estate is in probate, including his allotted lands, which must pass to enrolled members of the Yakama Nation under federal probate procedures, and all shares of King Mountain, which also will pass to his Yakama[-]enrolled family members."

increased the proportion of tobacco grown on trust land and incorporated into its manufactured products. In 2010 the "approximately 3.1% of the tobacco used [in 2009 had] risen to 9.5%. In 2011, it rose again, to 37.9%." *King Mountain Tobacco Co., Inc. v. McKenna*, 768 F.3d 989, 991 (9th Cir. 2014). By the end of 2013, King Mountain's products were composed "of at least 55 percent tobacco grown exclusively on allotted land held in trust by the United States for the beneficial use of ... Wheeler." The bulk of King Mountain's products are now manufactured by blending "[t]rust-land grown tobacco ... with non-trust-grown tobacco." King Mountain also manufactures a small amount of "'traditional use tobacco' that is intended for Indian ... ceremonial use" and consists entirely of trust land-grown tobacco.

The federal government imposes excise taxes on manufactured tobacco products, including cigars, cigarettes, and roll-your-own tobacco. *See* I.R.C. § 5701.**[2]** The current tax rate for cigarettes, for example, is approximately $1 per pack, or $10 per carton. *Id.* § 5701(b). The current tax rate for roll-your-own tobacco is approximately $24.78 per pound. *Id.* § 5701(g). Administered by the Treasury Department's Alcohol and Tobacco Tax and Trade Bureau ("TTB"), these excise taxes are assessed on the privilege of manufacturing tobacco products and determined at the time the tobacco products are removed from a factory or bonded warehouse. *See id.* §§ 5703(b), 5702(j).

---

**[2]** An excise tax is "[a] tax imposed on the manufacture, sale, or use of goods (such as a cigarette tax), or on an occupation or activity (such as a license tax or an attorney occupation fee)." *Excise Tax*, BLACK'S LAW DICTIONARY (West, 10th ed. 2014).

Although King Mountain initially paid federal excise taxes on its tobacco products, it began to fall behind in 2009. The Treasury gave King Mountain statutory notice, under I.R.C. § 5703(d), of the delinquent taxes and afforded the company an opportunity to show cause why the taxes should not be assessed.  King Mountain did not challenge the statutory notice.  Accordingly, the Treasury delegate timely made assessments against King Mountain for unpaid excise taxes, failure-to-pay penalties, failure-to-deposit penalties, and interest for periods in October, November, and December 2009.  In February 2010, the Treasury issued King Mountain a Notice and Demand for Payment pursuant to I.R.C. § 6303.  King Mountain paid the assessed taxes in installments over a five-month period in 2010, but it failed to pay the associated penalties and interest.  Eventually, King Mountain ceased paying federal excise taxes altogether.

This case has shuttled between the district court and our court on both procedural and substantive grounds.  Back in 2012, the United States brought suit against King Mountain to collect the delinquent taxes.  The suit was a companion to an earlier-filed action brought by King Mountain, Wheeler, and the Yakama Nation for declaratory and injunctive relief against the imposition of the federal tobacco excise tax on King Mountain's products.  *See King Mountain Tobacco Co., Inc. v. Alcohol & Tobacco Tax and Trade Bureau*, 996 F. Supp. 2d 1061 (E.D. Wash. 2014) (the "*Yakama* case"), *vacated and remanded sub nom. Confederated Tribes and Bands of the Yakama Indian Nation v. Alcohol & Tobacco Tax and Trade Bureau*, 843 F.3d 810 (9th Cir. 2016).  The district court granted the Government's motion to dismiss as to King Mountain and Wheeler on the basis that the claims were barred by the Anti-Injunction Act, 26 U.S.C. § 7421(a).   The court concluded, however, that the

Yakama's claims fell within the exception to the Anti-Injunction Act set forth in *South Carolina v. Regan*, 465 U.S. 367 (1984). *See King Mountain Tobacco Co., Inc. v. Alcohol & Tobacco Tax and Trade Bureau*, No. CV-11-3038-RMP, 2012 WL 12951864, at *4 (E.D. Wash. Sept. 24, 2012).

The district court then granted summary judgment in favor of the United States on the merits, reasoning that neither the General Allotment Act nor the Treaty with the Yakamas precluded the imposition of federal excise taxes. 996 F. Supp. 2d at 1067–70.

On appeal, we held that the Yakama Nation's suit was barred by the Anti-Injunction Act. 843 F.3d at 815–16. We thus vacated the judgment and remanded with instructions to dismiss the suit for lack of subject-matter jurisdiction. *Id.*

Back in the district court, the court granted summary judgment to the Government on King Mountain's liability for payment of the excise tax. Observing that the merits issues were "essentially identical" to those presented in the earlier *Yakama* case, the court expressly incorporated its conclusions of law from the summary judgment order. The district court reserved ruling on the amount of liabilities owed by King Mountain, however, in order to enable King Mountain to obtain additional discovery.

After further discovery, the district court granted summary judgment in favor of the government on the amount of King Mountain's liabilities—$57,914,811.27. However, when the district court entered final judgment in favor of the government, it accidentally omitted this amount from its order. The government quickly moved to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e) to reflect that King Mountain owed "to the United States federal tobacco excise tax liabilities totaling

$57,914,811.27 as of June 11, 2013, plus interest and other statutory additions accruing after that date until paid in full."

Before the district court could issue an amended judgment, however, King Mountain filed a timely notice of appeal. Citing Federal Rule of Civil Procedure 60(a), the district court initially ruled that it lacked jurisdiction to amend the judgment, but that it would do so if we remanded. Three months later, the district court reconsidered its ruling *sua sponte*, concluding that our precedent permitted it to correct the omission of the amount of judgment as a mere "clerical error." Accordingly, the district court granted the government's motion and amended the judgment. Again, King Mountain filed a timely notice of appeal, which is now before us.

## ANALYSIS

## I. APPELLATE JURISDICTION

Before considering the merits, we must resolve a preliminary question of appellate jurisdiction. *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) (holding that a court "generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in the suit"). Under 28 U.S.C. § 1291, we have jurisdiction of appeals from all "final decisions of the district courts," except of course where a direct appeal lies to the Supreme Court. As a result, "an appeal ordinarily will not lie until after final judgment has been entered in a case." *Cunningham v. Hamilton County, Ohio*, 527 U.S. 198, 203 (1999). According to King Mountain, the district court's amended judgment was not a "final judgment," and so we lack jurisdiction over the appeal of that order. We disagree.

The Supreme Court has cautioned that "no statute or rule . . . specifies the essential elements of a final judgment," *United States v. F. & M. Schaefer Brewing Co.*, 356 U.S. 227, 233 (1958), and "[n]o form of words and no peculiar formal act is necessary to evince" a final judgment, *United States v. Hark*, 320 U.S. 531, 534 (1944). But the Court has held that "a final judgment for money must, at least[] determine, or specify the means for determining, the amount" of the judgment. 356 U.S. at 233. At the very least, therefore, a money judgment lacks finality when it fails to "specify either the amount of money due the plaintiff or a formula by which the amount of money could be computed in mechanical fashion." *Buchanan v. United States*, 82 F.3d 706, 707 (7th Cir. 1996) (per curiam) (citing *F. & M. Schaefer Brewing Co.*, 356 U.S. at 227).

In this case, the amended judgment states that the United States is entitled to "57,914,811.27 as of June 11, 2013, plus interest and other statutory additions accruing after that date until paid in full." King Mountain does not dispute that the judgment adequately "specif[ies] the amount of money due" as of June 11, 2013. And King Mountain concedes that the Internal Revenue Code provides "highly mechanical" formulas for computing the statutory additions accruing thereafter. King Mountain objects, however, to the amended judgment's failure to specify the portions of the $57,914,811.27 award that are attributable to unpaid taxes, to unpaid penalties, and to unpaid interest, because King Mountain claims that it cannot determine how much it owes in statutory additions without those figures.

Assuming without deciding that the determination of the statutory additions depends on these figures, we conclude that the amended judgment sufficiently provides them. In the district court, the Government submitted the

"Transaction History Report," "Corrected Final Notice & Demand of Taxes Due / Notice of Intent to Levy," and "Second Corrected Final Notice & Demand of Taxes Due / Notice of Intent to Levy" that it had issued to King Mountain, collectively referred to as the "Blue Ribbon Transcript."   For each taxable period, the TTB's Blue Ribbon Transcript detailed the additional penalties and interest for failure to pay the amounts due.  The Government also introduced three binders containing "detailed copies of the computations done in connection with" the Blue Ribbon Transcript.  In granting the Government's renewed motion for summary judgment, the district court held that "the Blue Ribbon Transcript constitutes presumptive proof of a valid assessment."

The district court expressly entered the amended judgment "pursuant to" its order granting the United States' renewed motion for summary judgment, which ruled that the Government's Blue Ribbon Transcript "establishes [that] the . . . sum" of King Mountain's liability, as of June 11, 2013, was $57,914,811.27.  As explained above, the Blue Ribbon Transcript did not pull that sum from thin air.  Rather, it specified the exact amounts of King Mountain's unpaid taxes, unpaid penalties, and unpaid interest for each taxable period, and then added all of those amounts together.[3]  In other words, the amended judgment reduced the amounts of unpaid taxes, unpaid penalties, and unpaid interest *in the Blue Ribbon Transcript* to judgment.  Hence, a "remand to effectuate that intent is a matter of 'mere form.'"  *See Huey v. Teledyne, Inc.*, 608 F.2d 1234, 1237 (9th Cir. 1979) (quoting *Crosby v. Pac. S.S. Lines, Ltd.*, 133 F.2d 470, 474 (9th Cir. 1943)).   After all, King Mountain can easily

---

[3] King Mountain does not dispute the accuracy of the amounts listed in the Blue Ribbon Transcript.

calculate for itself how much of the $57,914,811.27 award is attributable to taxes, to penalties, and to interest by consulting the Blue Ribbon Transcript and compute the statutory additions accordingly.  Finality does not require the court to do all of the math.

Because the amended judgment sufficiently specified both "the amount of money due the plaintiff" as of June 13, 2013 and "a formula by which that amount of money" owed in statutory additions accruing thereafter "could be computed in mechanical fashion," *Buchanan*, 82 F.3d at 707, the amended judgment did not lack finality and we have jurisdiction of this appeal.  28 U.S.C. § 1291.

## II. IMPOSITION OF FEDERAL EXCISE TAX FOR TOBACCO PRODUCTS

The merits of King Mountain's tax appeal require us to decide whether a tobacco manufacturer located on trust land is subject to a federal excise tax applicable to all tobacco products "manufactured in . . . the United States."  I.R.C. § 5702.  The presumptive answer to that question is yes.  After all, the federal government enjoys plenary and exclusive power over Indian tribes.  *Bryan v. Itasca County*, 426 U.S. 373, 376 n.2 (1976).  And "[t]he right to tribal self-government is ultimately dependent on and subject to the broad power of Congress."  *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143 (1980).  For those reasons, Indians—like all citizens—are subject to federal taxation unless expressly exempted by a treaty or congressional

statute. *Hoptowit v. Comm'r*, 709 F.2d 564, 565 (9th Cir. 1983).[4]

King Mountain claims an exemption based on both a congressional statute—the General Allotment Act of 1887—and the Treaty with the Yakamas of 1855.

## A. GENERAL ALLOTMENT ACT

Congress passed the General Allotment Act of 1887, 24 Stat. 388 (codified as amended in scattered sections of 25 U.S.C.), in the midst of a major shift in national policy toward Indian tribes. By the late nineteenth century, the prevailing policy of segregating lands for the exclusive use and control of tribes had given way to a new policy of allotting those lands to tribe members individually. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 142 (1972) ("Allotment is a term of art in Indian law . . . . It means a selection of specific land awarded to an individual allottee from a common holding.") (citations omitted). The objectives of allotment were simple: to extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into society at large. *See, e.g.*, *In re Heff*, 197 U.S. 488, 499 (1905); *Blackfeet Tribe of Indians v. Montana*, 729 F.2d 1192, 1195 (9th Cir. 1984) (en banc) (observing that the "primary purpose" of allotment was the

---

[4] A state's authority to tax tribal members, on the other hand, is limited depending on the subject and location of the tax. *See McClanahan v. State Tax Comm'n*, 411 U.S. 164, 170–71 (1973); *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973). "The different standards stem from the state and federal government's distinct relationships with Indian tribes." *Ramsey v. United States*, 302 F.3d 1074, 1078 (9th Cir. 2002).

"speedy assimilation of the Indians"), *aff'd*, 471 U.S. 759 (1985).

Congress was selective at first, allotting lands under differing approaches on a tribe-by-tribe basis. *See* Cohen's Handbook of Federal Indian Law § 3.04 (Nell Jessup Newton ed., 2012) (hereinafter "Cohen's Handbook"); Paul W. Gates, *Indian Allotments Preceding the Dawes Act*, *in* The Frontier Challenge: Responses to the Trans-Mississippi West 141 (J. Clark ed. 1971). But the results of this initial policy proved unsatisfactory. Because allotted land could be sold immediately after it was received, many early allottees quickly lost their parcels through transactions that were unwise or even fraudulent. *See* Cohen's Handbook § 1.04. And even if sales were for fair value, allottees divested of their land were deprived of opportunities to acquire self-sustaining economic skills as landowners, which thwarted the congressional goal of assimilation.

Congress tried to address some of these problems in the General Allotment Act, which empowered the President to allot most tribal lands nationwide without the consent of the Indian nations involved. Section 5 of the Act, 25 U.S.C. § 348, for example, prohibited alienation or encumbrance of allotments by providing that each parcel would be held by the United States in trust for a twenty-five year period. Upon expiration of the trust period, which the President could extend at his discretion, the United States was to convey the land by patent "discharged of said trust and free of all charge or incumbrance whatsoever." 25 U.S.C. § 348. Only then would a fee patent issue to the allottee. *See United States v. Mitchell*, 445 U.S. 535, 543–44 (1980). Congress added Section 6, 25 U.S.C. § 349, as a later amendment to authorize the Secretary of the Interior to issue a patent in fee simple upon satisfaction that any Indian allottee is

"competent and capable of managing his or her affairs."  At that point, all "restrictions as to sale, incumbrance, or taxation of [the allotment] land" were to "be removed."  *Id.*[5]

The first (and only) Supreme Court decision recognizing a tax exemption under the General Allotment Act is *Squire v. Capoeman*, 351 U.S. 1 (1956).  In *Capoeman*, the Court held that the General Allotment Act exempted a "noncompetent Indian"[6] from federal capital-gains taxes on the proceeds of a sale of timber from his allotted land.  The taxpayer claimed that the tax constituted a "charge or incumbrance" on his land in violation of Section 5.  *See* 25 U.S.C. § 348.  The Supreme Court conceded that "the general words [of] 'charge or incumbrance' might well be sufficient to include taxation," 351 U.S. at 7, and observed that Congress "gave additional force to" that position when

---

[5] By 1934, however, Congress had abandoned the Act's emphasis on individual ownership and passed the Indian Reorganization Act, ch. 576, 48 Stat. 984 (1934) (codified at 25 U.S.C. §§ 461–479) (the "IRA"). "One of the purposes of the [IRA] was to put an end to the allotment system[,] which had resulted in a serious diminution of [the] Indian land base and which, through the process of intestate succession, had resulted in many Indians holding uneconomic fractional interests of the original allotments."  *Stevens v. Comm'r*, 452 F.2d 741, 748 (9th Cir. 1971). Accordingly, the IRA prohibited further allotment of Indian land, extended indefinitely existing periods of trust and restrictions on alienation of Indian lands, prohibited transfers of restricted lands except to Indian tribes, and limited testamentary disposition of such lands.  The IRA also authorized the Secretary of the Interior to acquire land in trust for Indians, restore remaining surplus lands to tribes, promulgate conservation regulations, and declare lands as new reservations or extensions of existing ones.  COHEN'S HANDBOOK § 1.05.

[6] The term "noncompetent Indian" refers to one who holds allotted land under a trust patent and who may not alienate or encumber that land without the consent of the United States.  *See Hoptowit*, 709 F.2d at 565 n.1.

it passed section 6, which provides for the "*removal*" of all restrictions "as to sale*, incumbrance, or taxation* of" allotment land upon the Secretary's issue of a fee patent. *Id.* (quoting 25 U.S.C. § 349) (emphases added).  "The literal language of [section 6]," the Court noted, "evinces a congressional intent to subject an Indian allotment to all taxes only after a patent in fee is issued to the allottee.  This, in turn, implies that, until such time as the patent is issued, the allotment shall be free from all taxes, both those in being and those which might in the future be enacted." *Id.* at 7–8.

But the Court concluded that the Act's tax exemption for trust land must also "extend[] to the *income* derived directly therefrom." *Id.* at 9 (quoting F. Cohen, Handbook of Federal Indian Law 265) (emphasis added) (footnote omitted). Noting that "[t]he purpose of the allotment system was to protect the Indians' interest and 'to prepare the Indians to take their place as independent, qualified members of the modern body politic,'" *id.* (quoting *Bd. of Comm'rs v. Seber*, 318 U.S. 705, 715 (1943)), the Court deemed it "necessary to preserve the trust and income derived directly therefrom" from taxation. *Id.*  But it affirmed that it was unnecessary "to exempt reinvestment income from tax burdens." *Id.* (citing *Superintendent of Five Civilized Tribes v. Comm'r*, 295 U.S. 418 (1935)).[7]

Relying on *Capoeman*'s language and the General Allotment Act, several circuits—including ours—have recognized federal tax exemptions for allotment land or the "income derived directly" from such land. *See, e.g.*, *Kirschling v. United States*, 746 F.2d 512, 513 (9th Cir.

---

[7] That was particularly true considering that Capoeman's allotment land "was not adaptable to agricultural purposes, and was of little value after the timber was cut." *Id.* at 4; *see also id.* at 10.

1984) (holding that an allottee "Indian's gift to a non-Indian of the proceeds from [allotted] timber lands" is exempt from the federal gift tax); *Stevens*, 452 F.2d at 746 (holding that "income derived from farming and ranching operations" on an allottee's lands is exempt from the federal income tax); *United States v. Daney*, 370 F.2d 791, 795 (10th Cir. 1966) (holding that bonuses from oil and gas leases of an Indian's allotted land are exempt from the federal income tax).

None of these cases, however, supports King Mountain's exemption from a federal tax on *manufactured tobacco products* at issue in this appeal. First, that tax is an *excise* tax, not a tax on land or income. *See Patton v. Brady*, 184 U.S. 608, 615 (1902) (holding that the federal tax on tobacco products, which was the precursor to I.R.C. § 5701 *et seq.*, is an excise tax). King Mountain concedes as much. But no court has held that the General Allotment Act's tax exemption extends to a federal excise tax of any kind. Indeed, our decisions explicitly recognize the limited "scope of [*Capoeman*'s] exemption" as extending only to "Indian lands" and "the *income derived directly therefrom*." *Dillon v. United States*, 792 F.2d 849, 854 (9th Cir. 1986).

That distinction makes good sense. Unlike an income or property tax, an excise tax is "[a] tax imposed on the manufacture, sale, or use of goods (such as a cigarette tax), or on an occupation or activity (such as a license tax or an attorney occupation fee)." Black's Law Dictionary (West, 10th ed. 2014); *see also Flint v. Stone Tracy Co.*, 220 U.S. 107, 151–52 (1911) ("[T]he requirement to pay such taxes involves the exercise of privileges . . . ."), *overruled on other grounds as stated in Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985); *United States v. 4,432 Mastercases of Cigarettes*, 448 F.3d 1168, 1185 (9th Cir. 2006) ("An excise tax . . . is one imposed on the performance

of an act . . . or the enjoyment of a privilege.") (second alteration in original) (citation and internal quotation marks omitted).**[8]**  In other words, the "obligation to pay an excise tax is usually based upon the *voluntary action* of the person taxed either for enjoying the privilege or engaging in the occupation which is the subject of the excise, and the element of *absolute and unavoidable demand* as in the case of property tax," or an income tax, "is lacking." *Munn v. Bowers*, 47 F.2d 204, 205 (2d Cir. 1931) (emphases added). And, quite unlike a property or income tax, the cost of an excise tax is easily—and in the case of tobacco products, virtually always—passed along to consumers.  The unique characteristics of excise taxes implicate few, if any, of the purposes of a tax on land or on income derived directly from the land.

Since *Capoeman*, the Supreme Court has hinted that federal excise taxes are categorically distinct from the sort of taxes from which trust lands are exempt under the General Allotment Act.  In *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation*, 502 U.S. 251 (1992), for example, the Court addressed whether a state could validly impose an excise tax on the sale of fee-patented lands—*i.e.*, allotments no longer held in trust by the United States.  *Id.* at 253.  The Court reiterated its longstanding, "*per se* rule" that "categorical[ly] prohibit[s] . . . state taxation" of Indians absent congressional authorization.  *Id.* at 267 (quoting *California v. Cabazon Band of Mission*

---

**[8]** The federal excise tax in this case, for example, is assessed on King Mountain's tobacco products upon removal from King Mountain's warehouse, regardless of whether those products are ultimately sold for a profit.  *See* I.R.C. § 5703(b)(1) (imposing excise tax "at the time of removal of the tobacco products and cigarette papers and tubes").

*Indians*, 480 U.S. 202, 215 n.7 (1987)).**[9]**  Applying that rule, the Court held that section 6 of the General Allotment Act does not authorize the state to impose an excise tax on sales of fee-patented land.

The Court acknowledged *Capoeman*'s dictum that "'the literal language of [section 6] evinces a congressional intent to subject an Indian allotment to *all* taxes' after it has been patented in fee." *Id.* at 268 (quoting 351 U.S. at 7–8); *see also* 25 U.S.C. § 349 (providing that upon issue of the fee patent, "all restrictions as to sale, incumbrance, or taxation of said land shall be removed").  But the Court explained that the phrase "'[a]ll taxes,' *in the sense of federal as well as local*, in no way expands the text [of the statute] beyond 'taxation *of . . . land.*'"  502 U.S. at 268. (first emphasis added).  The Court observed that the excise tax on land sales was not a tax "of . . . land," but rather a tax on "the Indian's *activity* of selling the land."  *Id.* at 269 (emphasis added).  Thus, it did not qualify as the sort of taxation that section 6 of the Act authorizes states to impose on fee-patented land.  *Id.* ("The short of the matter is that the General Allotment Act explicitly authorizes only 'taxation of . . . land,' not 'taxation with respect to land,' [or] 'taxation of transactions involving land.'").

Importantly, the Court in *Capoeman* was only able to imply a tax exemption into the General Allotment Act by reading sections 5 and 6 together.  *See generally* 351 U.S. at 7 (reading section 6's termination of "all restrictions as to sale, incumbrance, or taxation" into section 5's prohibition on any "charge or incumbrance").  If excise taxes are not

---

**[9]** The federal government—unlike the states—is categorically *permitted* to tax Indians unless expressly *prohibited* from doing so by a statute or treaty.  *See* COHEN'S HANDBOOK § 8.02.

taxes "on . . . land" within the meaning of section 6, *see County of Yakima*, 502 U.S. at 268, it follows that they are not taxes "on land" encompassed by "the general words 'charge or incumbrance'" in section 5. *See Capoeman*, 351 U.S. at 7; 25 U.S.C. § 349 (providing that upon issuance of a fee patent, "all restrictions as to sale, incumbrance, or taxation of said land shall be *removed*" (emphasis added)). And since the federal government, unlike the states, is categorically *permitted* to tax Indians unless expressly *prohibited* from doing so by a statute or treaty, *see* Cohen's Handbook § 8.02, *County of Yakima* is consistent with federal excise taxation of products manufactured on trust land. *Cf. Confederated Tribes of Warm Springs Reservation of Or. v. Kurtz*, 691 F.2d 878, 881–82 (9th Cir. 1982) (holding tribe was liable for federal excise tax on manufacture of truck chassis under I.R.C. § 4061 (repealed 1984)).

Additionally, we note that King Mountain's interpretation of the General Allotment Act as extending to federal excise taxes raises serious constitutional questions. The Constitution grants Congress the "power to lay and collect taxes, duties, imposts and excises," but guarantees that "all duties, imposts and *excises shall be uniform* throughout the United States."  U.S. Const. art. I, § 8. Legally speaking, allotments are part of the United States; they are land held by the federal government in trust for the benefit of individual Indians or tribes. *See* 25 U.S.C. § 348. Exempting allotments as King Mountain urges would, therefore, result in a federal excise tax on tobacco products that is not "uniform throughout the United States." *Cf. Head Money Cases*, 112 U.S. 580, 594 (1884) (holding that a "tax is uniform when it operates with the same force and effect in every place where the subject of it is found").  Under the circumstances, the constitutional avoidance canon favors the

Government's interpretation of the Act, which exempts only the trust land and income derived directly therefrom from federal taxation. That interpretation is not inconsistent with our case law and would in no way jeopardize the uniformity of congressional excises "throughout the United States." *See Clark v. Martinez*, 543 U.S. 371, 381 (2005) ("[O]ne of the canon's chief justifications is that it allows courts to *avoid* the decision of constitutional questions. It is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts.").

Furthermore, even assuming that the General Allotment Act's exemption extends to federal excise taxes, King Mountain cannot prevail because the excise tax in this case does not "encumber" any allotment land. *See United States v. Anderson*, 625 F.2d 910, 914 (9th Cir. 1980) ("[W]e recognized that *Capoeman*'s point was that if an Indian's allotted land (or the income directly derived from it) was taxed, and the tax was not paid, the resulting tax lien on the land would make it impossible for him to receive the land free of 'incumbrance' at the end of the trust period.").

For one thing, King Mountain is not the allottee of any trust land. The land on which King Mountain operates was allotted to and held in trust for Delbert Wheeler (and now for his estate)—not King Mountain. The only trust land used to grow tobacco for King Mountain's products was allotted to Wheeler or to other Yakama members—not King Mountain. In the context of income taxation, we have held that "the General Allotment Act provides no tax exemption for the income a noncompetent Indian derives from other Indians' [trust land], or his tribe's trust land." *Id.*; *see also Fry v. United States*, 557 F.2d 646, 648 (9th Cir. 1977). That

principle recognizes that because "taxation of the taxpayer's individual profit derived from his lease of tribal (or other allottees' trust) land cannot possibly represent a burden or encumbrance upon the tribe's (or other allottees') interest in such land." *Anderson*, 625 F.2d at 914.  *Anderson*'s reasoning applies with equal force to products that a corporation manufactures on, or with the fruits of, trust land allotted to others.  Since no allottee of trust land is liable for the excise tax in this case, an exemption would be inconsistent with *Anderson*'s logic.

Additionally, I.R.C. § 5763(d)'s threat of property forfeiture "to the United States" does not apply to allotment land.  Most obviously, the United States is already the titleholder of those lands.  *See* 25 U.S.C. § 348 (providing that "the United States does and will hold the land . . . allotted" under the Act).  King Mountain fails to explain how it is possible to "forfeit" land to the existing titleholder.  And again, King Mountain is not the allottee of the trust land on which it operates.  Thus, King Mountain itself has no land, or even a trust relationship with the United States, to "forfeit" as a penalty for nonpayment.  Any liability incurred by King Mountain cannot result in a lien on or forfeiture of allotment land, because the allotment on which King Mountain operates is held *in trust* for Wheeler's estate.  *See Trust*, Black's Law Dictionary (West, 10th ed. 2014) ("The right, enforceable solely in equity, to the beneficial enjoyment of property to which another person holds the legal title; a property interest held by one person . . . for the *benefit of a third party*. . . .") (emphasis added).  The same is true of allotments held in trust for other Indians that are used to grow tobacco for King Mountain's products.

Notably, IRS regulations expressly prohibit forfeiture or attachment of tax liens to property held in trust "by the

United States for an individual incompetent Indian." *See* 26 C.F.R. § 301.6321-1 (2017).   That is because the regulations exclude allotment land from the definition of "property" in which rights are extinguished, and which may be subject to forfeiture or lien, under the Code.   *See* 26 C.F.R. § 301.6321-1 (2017).  Like the district court, we are aware of no authority "permitting the forfeiture of allotment land under any statute" or even "applying [the forfeiture provisions of the Code] to . . . real property, as opposed to personal property, even real property belonging to non-Indians."

We thus hold that the General Allotment Act does not provide a tax exemption from the federal excise tax on manufactured tobacco products.  King Mountain is liable for payment of the tax and associated penalties and interest.

## B. TREATY WITH THE YAKAMAS

In the 1850s, the United States entered into a series of treaties with Indian tribes to extinguish the last set of conflicting claims to lands lying west of the Cascade Mountains and north of the Columbia River in what is now the State of Washington.  *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 661–62 (1979).  The Treaty with the Yakamas, 12 Stat. 951 (1855) (the "Treaty") was among those treaties.  Under the Treaty, the Yakama ceded certain lands to the United States, while other lands—and attendant rights therein—were reserved to the Yakama.  12 Stat. at 951–52.  The latter lands now comprise the Yakama Indian Reservation in southern Washington State, where King Mountain operates.

Courts have recognized that the "Treaty embodies spiritual as well as legal meaning for the [Yakama]; it enumerates basic rights secured to the Yakama[] that

encompass their entire way of life." *Yakama Indian Nation v. Flores*, 955 F. Supp. 1229, 1238 (E.D. Wash. 1997). Those "basic rights" appear in each of the Treaty's eleven articles.  This appeal implicates Articles II, III, and VI.

Article II of the Treaty establishes the physical boundaries of the Yakama reservation in Washington State and prohibits non-Indians from inhabiting reservation land unless an exception applies.    After delineating the reservation's boundaries, Article II provides that "[a]ll . . . tract [land] shall be set apart . . .for the exclusive use and benefit of said confederated tribes and bands of Indians, as an Indian reservation . . . ."  12 Stat. at 952.  Article II also affords compensation to the Yakama for their improvements to lands that were ceded to the United States.  *Id.*

Article III addresses the Yakama's right to travel.  Prior to the signing of the Treaty, the Yakama traveled extensively.   "Travel was significant for many reasons, including trade, subsistence, and maintenance of religious and cultural practices." *Flores*, 955 F. Supp. at 1238.  The most important of these reasons, however, was trade.  The Yakama's "way of life depended on goods that were not available in the immediate area; therefore, they were required to travel to the Pacific Coast, the Columbia River, the Willamette Valley, California, and the plains of Wyoming and Montana to engage in trade." *Id.*   Thus, Article III of the Treaty reserves to the Yakama the right to travel on public highways and the right to fish and hunt.  In relevant part, Article III reads:

> *And provided*, That, if necessary for the public convenience, roads may be run through the said reservation; and on the other hand, the right of way, with free access from the same to the nearest public highway, is

> secured to them; as also the right, in common
> with citizens of the United States, to travel
> upon all public highways.

12 Stat. at 952–53. During Treaty negotiations, then-Governor of the newly created Washington Territory, Isaac Stevens, made explicit the economic purpose of the Yakama's right to travel:

> You will be allowed to go on the roads to take
> your things to market, your horses and cattle.
> You will be allowed to go to the usual fishing
> places and fish in common with the whites,
> and to get roots and berries and to kill game
> on land not occupied by the whites. All that
> outside the reservation.

In the years after the Treaty was negotiated and ratified, the Yakama continued to travel off-reservation extensively for trading purposes. *Flores*, 955 F. Supp. at 1245.

Finally, Article VI of the Treaty provides for the division of reservation lands into individual lots, much like the General Allotment Act:

> The President may, from time to time, at his
> discretion, cause the whole or such portions
> of such reservation as he may think proper, to
> be surveyed into lots, and assign the same to
> such individuals or families of the said
> confederated tribes and bands of Indians as
> are willing to avail themselves of the
> privilege, and will locate on the same as a
> permanent home.

12 Stat. at 954.[10]  Article VI further guarantees that any such division will occur "on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas."  *Id.*  In turn, the Treaty with the Omaha provides that individual lots "shall not be aliened or leased for a longer term than two years; and shall be exempt from levy, sale, or forfeiture . . . ."  10 Stat. 1043, 1044–45 (1854).

King Mountain contends that each of these provisions bestows an exemption from the federal excise tax on manufactured tobacco products.  "The applicability of a federal tax to Indians depends on whether express exemptive language exists within the text of the . . . treaty."  *Ramsey*, 302 F.3d at 1078.  The requisite "language need not explicitly state that Indians are exempt from the specific tax at issue; it must only provide evidence of the federal government's intent to exempt Indians *from taxation*."  *Id.* (emphasis added).

As explained below, the Treaty with the Yakamas does not contain "express exemptive language" sufficient to relieve King Mountain of its liability for the federal excise tax on manufactured tobacco products.  For that reason, we also decline to apply the Indian canons of construction when analyzing the Treaty's provisions.  *See Carpenter v. Shaw*, 280 U.S. 363, 367 (1930) ("Doubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith.").

---

[10] In this sense, Article VI was a harbinger of the General Allotment Act.

The canon of construction favoring Indians "when ambiguities are present in a statute or treaty does not come into play absent [express exemptive] language." *Ramsey*, 302 F.3d at 1079. King Mountain contends that *Capoeman* "held that when both Treaty and General Allotment Act claims are at issue, the court applies the Indian canons of treaty construction." But *Capoeman* did not so hold. To be sure, *Capoeman* did apply the Indian canon, but it exclusively analyzed a General Allotment Act issue. *Capoeman* did not, however, establish a different analytical framework for treaty interpretation where, as in this case, potential exemptions under both the General Allotment Act and a treaty are at issue. And in *Dillon*, we analyzed the Treaty and the General Allotment Act issues separately, refusing to employ the Indian canons to the Treaty claims absent "definitively expressed" exemptive language. 792 F.2d at 853. Like the district court, we therefore decline to apply the Indian canons of construction to King Mountain's treaty claims.

### 1.   Article II

Article II of the Treaty provides that "[a]ll . . . tract land shall be set apart[] for the exclusive use and benefit of said confederated tribes and bands of Indians, as an Indian reservation . . . ." 12 Stat. at 952. King Mountain's argument that this language provides an exemption the federal excise tax is foreclosed by our decision in *Hoptowit*. *See* 709 F.2d at 566. In *Hoptowit*, we held that "*any* tax exemption created by" the "exclusive use and benefit" language in Article II of the Treaty tracks the exemption recognized in *Capoeman* for land or "income derived directly from the land." *Id.* As King Mountain acknowledges, the federal excise tax applies to neither of those.

King Mountain goes on to claim that *Hoptowit* is distinguishable because it "only addressed per diem payments received by a Tribal Council member that were not related to an allotment or manufacture of a product on an allotment." But *Hoptowit*'s language is clear: the scope of "*any* exemption" under Article II is "*limited to* the income derived directly from the land." 709 F.2d at 566 (emphases added). To the extent Article II contains "express exemptive language," *Hoptowit* confirms that such language does not afford an exemption from federal excise taxes, including those on manufactured tobacco products.

## 2. Article III

Article III of the Treaty provides "[t]hat, if necessary for the public convenience, roads may be run through the [Yakama] reservation," but that "the right of way, with free access from the same to the nearest public highway, is secured to [the Yakama]; as also the right, in common with citizens of the United States, to travel upon all public highways." 12 Stat. at 952–53.

With respect to Article III, King Mountain's argument is foreclosed by *Ramsey*. In *Ramsey*, we held that the Treaty with the Yakamas does not exempt Yakama Indians from federal excise taxes on heavy-vehicle and diesel-fuel use. 302 F.3d at 1080. We reasoned that Article III's guarantees of "free access from the [reservation] to the nearest public highway" and of the "right, in common with citizens of the United States, to travel upon all public highways," 12 Stat. at 953, do not "provide express language from which we can discern an intent to exempt the Yakama from federal heavy vehicle and diesel fuel taxation." 302 F.3d at 1079–80.

The threshold inquiry is whether the language of the Treaty "provide[s] evidence of the federal government's

intent to exempt Indians from *taxation*," *id.* at 1078 (emphasis added)—not whether the language of the Treaty evinces the Government's intent to exempt Indians from a *particular* tax. *Ramsey*, 302 F.3d at 1079 ("Only if express exemptive language is found in the text of the . . . treaty should the court determine if the exemption applies to the tax at issue."). If the language of Article III did not provide sufficient evidence of the Government's intent to exempt the Yakama from federal taxation in *Ramsey*, it surely does not provide sufficient evidence of an intent to exempt the Yakama from federal taxation here. *See id.* at 1080 ("[W]e hold that [Article III] contains no 'express exemptive language.'"). That *Ramsey* involved "off-reservation activities" and a different federal tax, is immaterial.[11] The language in Article III simply does not implicate taxation by the federal government.

King Mountain's reliance on *United States v. Smiskin*, 487 F.3d 1260 (9th Cir. 2007), is misplaced. *Smiskin* involved a criminal prosecution of two Yakama Indians under the federal Contraband Cigarette Trafficking Act, which expressly incorporates *state law* requirements related to cigarette taxation. *Id.* at 1262. The Washington law at issue in *Smiskin*, for example, requires that "individuals give notice to state officials prior to transporting unstamped cigarettes within the State." *Id.* at 1262. The defendants in *Smiskin* had not done so. *Id.* Thus, "[t]he critical question" was "whether applying *the State of Washington's* pre-notification requirement to Yakama tribal members who

---

[11] Contrary to King Mountain's assertions, this case does not "involve[] an excise tax on the right to travel." *See Flint*, 220 U.S. at 162 (noting that, with respect to an excise tax, "[i]t is [the] distinctive *privilege* which is the subject of taxation," not discrete acts associated with the privilege) (emphasis added).

possess and transport unstamped cigarettes violates the Yakama Treaty of 1855." *Id.* at 1264 (emphasis added). The "express exemptive language" required to relieve Indians from *federal taxation* was not at issue.

### 3.   Article VI

Article VI of the Treaty authorizes the President to "cause the whole or such portions of such reservation as he may think proper, to be surveyed into lots," and guarantees that such division would occur "on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas."   12 Stat. at 954. Article VI of the Treaty with the Omaha, 10 Stat. 1043, in turn, provides that such lots "shall not be aliened or leased for a longer term than two years; and *shall be exempt from levy, sale, or forfeiture . . . .*"   *Id.* at 1044–45 (emphasis added).

With respect to Article VI, King Mountain's argument fails under *Dillon*.   In *Dillon*, we concluded that "[t]he suggestion that an income tax exemption can be inferred from the alienation restrictions in Article 6 of the Treaty is not well founded."   792 F.2d at 853.   The Supreme Court appears to take the same position.   *See Superintendent of Five Civilized Tribes*, 295 U.S. at 421 ("Non-taxability and restriction upon alienation are distinct things."); *see also id.* (noting that an Indian's "wardship [status] with limited power over his property does not, without more, render him immune from the common burden").   Although this case involves an excise tax, rather than an income tax, the distinction that the Supreme Court, and we, have drawn between "non-taxability" and "restrictions upon alienation" applies with equal force.   Simply put, we have concluded that the restrictions on alienation in Article VI do not implicate federal taxation.   *Dillon*, 792 F.2d at 853.

King Mountain argues that *Capoeman* "confirmed that the phrase in the text of the General Allotment Act prohibiting any 'charge or incumbrance' on allotted lands was sufficient to include taxation," and that the "same approach is required under the similar language contained in Article VI." But Article VI's language is not so similar. Indeed, the phrase "exempt from levy, sale, or forfeiture" that is incorporated by reference into Article VI of the Treaty is considerably more specific than the phrase all "charge and incumbrance" in the General Allotment Act. "Exempt from levy, sale or forfeiture" distinctly imposes a few enumerated "restrictions upon alienation," *Superintendent of Five Civilized Tribes*, 295 U.S. at 421, while "charge and incumbrance" does not.[12] For that reason, *Dillon*, and not *Capoeman*, controls, and King Mountain is not entitled to an exemption under Article VI.[13]

In sum, we hold that no provision of the Treaty with the Yakamas contains "express exemptive language" sufficient to exempt King Mountain from liability for the federal excise tax on manufactured tobacco products.

## CONCLUSION

We affirm our longstanding rule that Indians—like all citizens—are subject to federal taxation unless expressly exempted by a treaty or congressional statute. *Hoptowit*, 709 F.2d at 566. In this case, neither the General Allotment

---

[12] Moreover, as already noted, I.R.C. § 5763(d) does not apply to allotment land.

[13] In any event, *Capoeman* only recognizes that the language "charge or incumbrance" is sufficient for an exemption from federal taxation of the *land* or *income* derived directly therefrom, not from a federal excise tax. 351 U.S. at 7–8.

Act nor the Treaty with the Yakamas expressly exempts King Mountain from the federal excise tax on manufactured tobacco products.  King Mountain is therefore liable for payment of the tax and associated penalties and interest.

**AFFIRMED.**